## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA JOHNSON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 13-4238 |
| NEWCOURTLAND, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                                March 3, 2015

Currently pending before the Court is the Motion for Summary Judgment by Defendants

NewCourtland, Inc. ("NewCourtland") and Tiffany Sanford-Adams ("Sanford-Adams")

(collectively "Defendants").  For the following reasons, the Motion is granted in its entirety.

## I.    FACTUAL BACKGROUND

### A.    Plaintiff's Employment at Defendant NewCourtland

Defendant NewCourtland is a Pennsylvania non-profit corporation headquartered in

Philadelphia, Pennsylvania that is engaged in the business of providing health and housing

services to Philadelphia's elderly population.  (Defs.' Mot. Summ. J., Ex. A., Decl. of Tiffany

Sanford-Adams, ¶ 3, May 9, 2014 ("Sanford-Adams Decl.").)  NewCourtland operates senior

centers andresidential facilities for the elderly, and currently manages one nursing home.  (Id. ¶

4.)  Prior to 2011, NewCourtland managed the following seven nursing homes: (1) Cheltenham

York Road Nursing and Rehabilitation Center; (2) Cliveden Convalescent Center; (3)

Germantown Home; (4) Care Pavilion of Walnut Park; (5) Maplewood Manor; (6) Kearsley

Long Term Care Center, II; and (7) Tucker House II, Inc.  (Id. ¶ 7.)  On June 30, 2011, all of the

nursing homes managed by NewCourtland, except for the Germantown Home, were sold and the

NewCourtland management contracts at those facilities were terminated.  (Id. ¶ 8.)  Defendant

Tiffany Sanford-Adams is currently the Assistant Vice-President of Human Resources at

NewCourtland.  (Id. ¶ 2.)  At the time of Plaintiff's termination from NewCourtland, Sanford-

Adams was Plaintiff's supervisor and made the decision to terminate Plaintiff.  (Defs.' Mot.

Summ. J., Ex. B, Dep. of Tiffany Sanford-Adams, 56:11–23, 65:17–66:17, Feb. 4, 2014

("Sanford-Adams Dep.").)

 Plaintiff began working for NewCourtland in 2005 at the Cheltenham York Road Nursing

and Rehabilitation Center ("Cheltenham").  (Defs.' Mot. Summ. J., Ex. D.)  Between 2005 and

2011, Plaintiff worked at several other NewCourtland facilities assisting the Human Resources

departments.  (Defs.' Mot. Summ. J., Ex. F, Dep. of Lisa Johnson, 16:2–12, 29:2-19, May 18,

2012 ("2012 Johnson Dep.").)  After the sale of six NewCourtland-managed facilities in 2011,

Plaintiff was hired to work at the one remaining nursing facility, Germantown Home, as a

NewCourtland employee.  (Id. at 29:12–21.)  This new position came with a promotion to the

position of Human Resources Generalist and a raise to a salary of $51,480 from her previous

salary of $48,459.84.  (Defs.' Mot. Summ. J., Exs. G, H; Def.'s Mot. Summ. J., Ex. E, Dep. of

Lisa Johnson, 17:6–9, March 10, 2014 ("2014 Johnson Dep.").)  Notably, during the entire

course of Plaintiff's employment with NewCourtland, a strict confidentiality policy was in effect,

which stated, in pertinent part:

 In the course of performing your duties on behalf of the NewCourtland Network, you

> may, from time to time, be placed in a position of trust and confidence in which you receive or contribute to the creation of confidential and/or proprietary information relative to the operation of the NewCourtland Network.  Access to and transmittal of any confidential information is strictly limited to that needed for the performance of any employee's duties related to their position to further Company's business interests, and employees may not use or disclose such confidential and/or proprietary information for personal gain or for any purpose which does not further and/or that is inconsistent with the business interests of the NewCourtland Network.

(Defs.' Mot. Summ. J., Ex. K.)  Plaintiff agreed that adherence to this policy was a core requirement for working in the nursing home facilities.  (2012 Johnson Dep. 94:18–95:12.)

### B.      The *Dorsey* Litigation

In September 2009, while Plaintiff was working in the Human Resources Department of the Cheltenham facility of NewCourtland, Plaintiff's sister, Tanya Dorsey ("Dorsey"), applied for a maintenance position at the same facility.  (2014 Johnson Dep. 17:16–25; First Am. Compl. ¶ 16.)  Plaintiff processed Dorsey's application.  (First Am. Compl. ¶ 17.)  As part of her application, Dorsey was required to complete and sign a written application, certifying its accuracy.  (Defs.' Mot. Summ. J., Ex. M.)  Dorsey interviewed twice for the position, but was not hired.  (Defs.' Mot. Summ. J., Ex. N, Dep. of Tanya Dorsey, 112:24–113:25, 128:10–24, 152:2–18, Feb. 28, 2012 ("Dorsey Dep.").)

Dorsey subsequently called Plaintiff and told her that, based on the questions at her interview, she felt like she was being discriminated against as a woman and was considering filing a claim with the Equal Employment Opportunity Commission ("EEOC").  (Id. at 162:13–163:8.)  Plaintiff informed her supervisor, Sharon Gaumont, about Dorsey's concerns and plans to go to the EEOC.  (2014 Johnson Dep. 20:2–23.)  On Plaintiff's advice, Dorsey reapplied for the position in the maintenance department at Cheltenham and was granted a third

interview.  (Dorsey Dep. 162:3–163:24.)  Again, however, she was not hired for any position.
(First Am. Compl. ¶ 18.)

In May 2010, Dorsey filed a charge with the EEOC alleging gender discrimination.
(Defs.' Mot. Summ. J., Ex. O.)  That charge included confidential information related to the
other applicants for the maintenance position at Cheltenham, including one applicant's amount of
experience and drug test results, and another applicant's "background test" results.  (Id.)  The
Human Resources Manager at Cheltenham, Sharon Gaumont, testified that only she and Plaintiff
knew such information and, since Gaumont did not provide that information to Dorsey, she felt
that it must have come from Plaintiff.  (Defs.' Mot. Summ. J., Ex. P, Dep. of Sharon Gaumont,
49:20-50:14, March 6, 2014 ("Gaumont Dep.").)  Gaumont spoke with Sanford-Adams about
this suspicion, but Sanford-Adams did not discipline Plaintiff because of insufficient proof.  (Id.
at 51:15–52:8.)

Thereafter, in August 2011, Dorsey commenced federal litigation, and NewCourtland
learned that Plaintiff would be a witness in support of her sister's discrimination claim.  (2014
Johnson Dep. 33:7–16.)  Dorsey's complaint specifically identified Plaintiff as a person with
information.  (Def.'s Mot. Summ. J., Ex. Q, ¶¶ 26–29.)  On February 28, 2011, Dorsey gave her
deposition, at which time she testified that Plaintiff filled out and signed the employment
application in Dorsey's name and that the application contained inaccurate information.  (Dorsey
Dep. 88:21–89:25, 100:13–102:25, 108:8–24, 111:4–12.)  Dorsey also affirmatively stated that
Plaintiff provided her with various pieces of information that were included in the EEOC charge,
including other candidates' qualifications, drug tests, background checks, and rates of pay to be
offered to those candidates.  (Id. at 185:5–188:19.)  She further indicated that she later tried to

cross out many of these references to confidential information because she felt that Plaintiff should not have revealed such information.  (Id. at 196:5–198:8.)

    **C.**    **Plaintiff's Termination and Lawsuit Against Defendants**

Three days after Dorsey's deposition, NewCourtland terminated Plaintiff's employment on the grounds that Plaintiff (1) falsified Dorsey's employment application and (2) improperly disclosed confidential information.  (Defs.' Mot. Summ. J., Ex. J; 2012 Johnson Dep. 53:18–24.) According to Plaintiff, her termination deviated from typical procedures at NewCourtland. Generally, NewCourtland would conduct an investigation by first presenting the employee with the accusation, then provide the employee an opportunity to submit an explanation or write a statement, and, if necessary, suspend the employee pending the results of the investigation before the final decision was made.  (2014 Johnson Dep. 144:4–145:24.)  In Plaintiff's experience, she had never seen the process abandoned, and there had always been an investigation and an opportunity for the employee to make a statement, even for serious infractions.  (Id. at 146:2–147:2.)  Yet, when Plaintiff was terminated, she was not issued any progressive discipline, Defendants did not conduct an investigation, and Plaintiff was not given an opportunity to issue a statement on her own behalf.  (Id. at 152:19–153:19.)

Subsequently, on April 12, 2012, Plaintiff filed a charge of discrimination with the EEOC claiming that she was subjected to retaliation in violation of Title VII of the Civil Rights Act of 1964 based on her role as a "critical witness" in her sister's gender discrimination claim.  (Defs.' Mot. Summ. J., Ex. R.)  Plaintiff initiated the present litigation against Cheltenham and Sanford-Adams on July 22, 2013, and filed a First Amended Complaint on August 16, 2013, dropping Cheltenham as a defendant and adding NewCourtland.  (Defs.' Mot. Summ. J., Ex. C.)

The First Amended Complaint consists of three counts.  Counts I and II allege retaliation under Title VII and the Pennsylvania Human Relations Act ("PHRA") because Plaintiff was allegedly terminated for (a) expressing her concerns to Defendants regarding the discriminatory manner in which Dorsey was not hired; (b) assisting Dorsey in her EEOC proceedings; (c) being a critical witness in Dorsey's lawsuit; (d) offering favorable testimony in support of Dorsey; and (e) maintaining a close relationship with Dorsey.  (First Am. Compl. ¶ 26.)  Count III sets forth a retaliation claim against NewCourtland and Sanford-Adams under 42 U.S.C. § 1981, based on Plaintiff's alleged complaints to Defendants that she had witnessed NewCourtland management make derogatory and discriminatory remarks about African-American employees within NewCourtland.[1]  (Id. ¶¶ 32–33.)

During Plaintiff's March 10, 2014 deposition in this case, Plaintiff admitted that she filled out parts of her sister's employment application and signed her sister's name at the bottom. (2014 Johnson Dep. 43:4–44:8, 45:18–46:2.)  Plaintiff understood that the signature on the bottom, which certified the truth and accuracy of the information in the application, was an important part of the hiring process.  (Id. at 46:18–48:1.)  Although Plaintiff emphasized that she accurately put the information given to her by Dorsey on her application, she admitted that she could not verify independently the accuracy of what Dorsey told her.  (Id. at 56:9–59:12.)

Additionally at her deposition, Plaintiff admitted that Dorsey's EEOC Charge contained confidential information and that disclosure of such information would be a valid cause for

---

[1] Plaintiff concedes that she has not adduced sufficient evidence to proceed on her 42 U.S.C. § 1981 claim, and thus will only proceed on her claims under Title VII and the PHRA. (Pl.'s Resp. Opp'n Summ. J. 3.)  Indeed, at her deposition, Plaintiff denied that she was retaliated against for any complaints she made regarding derogatory comments.  (2014 Johnson Dep. 79:3–80:4.)

termination.  (2014 Johnson Dep. 113:2–116:25.)  Although she generally denied giving away confidential information, Plaintiff admitted telling Dorsey that other applicants were less qualified than her based on information Plaintiff took from other applicants' applications for employment.  (2014 Johnson Dep. 24:8–26:2.)

    **D.**    **Procedural History of Present Motion**

    On May 9, 2014, Defendants filed the present Motion for Summary Judgment seeking dismissal of Plaintiff's case.  Plaintiff responded on May 26, 2014 and Defendants filed a Reply Brief on June 5, 2014.  On January 15, 2014, the case was reassigned to the Undersigned's docket, and this Court heard oral argument on February 4, 2015.  Upon consideration of the parties' briefs, together with their recent oral arguments, the Court now discusses the Motion at hand.

**II.**    **STANDARD OF REVIEW**

    **A.**    **Summary Judgment Standard of Review**

    Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

    On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Section 704(a) of Title VII provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).  To establish discriminatory retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.[2]  Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995).  Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of retaliatory intent under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ("Price Waterhouse" ), or indirect evidence of retaliation under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ("McDonnell Douglas").[3]  Plaintiff argues that her case survives scrutiny under both standards.

### A.        Direct Evidence Standard Under *Price Waterhouse*

In order for a plaintiff to come within the Price Waterhouse framework, he or she must present direct evidence of discrimination.  Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994).  The Third Circuit has stated that such direct evidence "must directly reflect a discriminatory or retaliatory animus on the part of the person involved in the decisionmaking

---

[2]  The analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000). Accordingly, the Court addresses the Title VII and PHRA claims jointly.

[3]  Plaintiff contends that there are three separate tests that could be applied: (1) direct evidence standard; (2) mixed-motive standard; and (3) the McDonnell-Douglas burden shifting analysis.  (Pl.'s Resp. Opp'n Summ. J. 16 n.2.)  The first two tests, however, are actually one and the same.  Under the modified Price Waterhouse standard, a defendant is liable for discrimination upon direct evidence that a forbidden criterion "was a motivating factor for any employment practice, even though other factors also motivated the practice."  Garges v. People's Light & Theatre, Co., No. Civ.A.09-2456, 2012 WL 6592201, at *12 (E.D. Pa. Dec. 17, 2012) (citing 42 U.S.C. § 2000e–2(m)), aff'd 529 F. App'x 156 (3d Cir. 2013); see also Silvestre v. Sera Care, Inc., No. Civ.A.02-446, 2002 WL 32341778, at *4 (E.D. Pa. Dec. 27, 2002) (referring to "direct evidence" and "mixed motives" interchangeably).

process." Id. (citing Griffiths v. CIGNA Corp., 988 F.2d 457, 470 (3d Cir. 1993)). A plaintiff

attempting to prove discrimination with direct evidence faces a "high hurdle." Walden v.

Georgia–Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997). Justice O'Connor, in her concurrence

with the Price Waterhouse plurality, stated:

> [S]tray remarks in the workplace, while perhaps probative of sexual harassment,
> cannot justify requiring the employer to prove that its hiring or promotion decisions
> were based on legitimate criteria. Nor can statements of nondecisionmakers, or
> statements by decisionmakers unrelated to the decisional process itself, suffice to
> satisfy the plaintiffs' burden in this regard. . . . What is required is . . . direct evidence
> that decisionmakers placed substantial negative reliance on an illegitimate criterion
> in reaching their decision.

Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring) (citation omitted).

In the present case, Plaintiff asserts that Defendants' stated basis for her termination

constitutes direct evidence of retaliation. Specifically, Plaintiff explains that "Defendants'

articulated reason for Ms. Johnson's termination (i.e. that she was terminated for disclosing

confidential information that was used to assist Ms. Dorsey in her EEOC charge of

discrimination and subsequent federal discrimination lawsuit) cannot be considered anything

other than 'direct evidence.'" (Pl.'s Resp. Opp'n Summ. J. 20.) Moreover, Plaintiff asserts that

the retaliatory statements in this case were made by the same individuals who reached the

decision to terminate her, and that the statements were directly related to the decisional process

itself.

Plaintiff's argument, however, is premised on the faulty assumption that Defendants'

expressed reason for Plaintiff's termination—disclosure of confidential information—constitutes

protected activity. Protected activities fall into two distinct categories under Title VII's

anti-retaliation provision: (1) opposition to an employer's discriminatory employment practices;

10

or (2) participation in an ongoing investigation or proceeding conducted pursuant to Title VII. 42 U.S.C. § 2000e–3(a). It is well established among federal courts that Title VII does not lightly protect employees who violate their duty of confidentiality by providing personnel information to outside third parties for purposes of assisting with an employment discrimination lawsuit. For example, in O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756 (9th Cir. 1996), the plaintiff was denied a promotion and, one month later, was laid off as part of a company-wide reduction in force. Id. at 758. After he was denied the promotion, but before he was laid off, he rummaged through his supervisor's office and found documents he believed supported his suspicion that he was discriminated against because of his age. Id. He photocopied many of these documents, despite knowing that they were confidential or marked as "personal/sensitive," and showed some of them to a co-worker. Id. After the layoff, he brought an age discrimination suit, at which time the company learned of his misconduct in taking the documents and changed his status from "layoff" to "terminated." Id. at 758. The plaintiff asserted that his stealing of documents was protected activity because his purpose was to preserve evidence for future litigation. Id. at 762–63. The Ninth Circuit disagreed and held that "[i]n balancing an employer's interest in maintaining a 'harmonious and efficient' workplace with the protections of the discrimination laws, we are loathe to provide employees with the incentive to rifle through confidential files looking for evidence that might come in handy in later litigation." Id. at 763. The court concluded that, "[t]he opposition clause protects reasonable attempts to contest an employer's discriminatory practices; it is not an insurance policy, a license to flaunt company rules or an invitation to dishonest behavior." Id. at 763–64.

Similarly, in Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253 (4th

11

Cir. 1998), the Metropolitan Airports Authority ("Metro") discharged the plaintiff after she admitted during a deposition that she had taken confidential personnel documents from her supervisor's desk and provided those documents to a former employee who later filed an employment discrimination suit against Metro.  Id. at 256–57.  The Fourth Circuit concluded that Metro's interest in maintaining the security and confidentiality of sensitive personnel documents outweighed the plaintiff's interest in providing those documents to the former employee.  Id. at 260.  In reaching its conclusion in Laughlin, the Fourth Circuit explained that while some opposition activities merit protection under the opposition clause, "Laughlin's drastic actions [were] not akin to the measured responses to employer discrimination that we have approved in the past."  Id.

Likewise, in Niswander v. Cincinnati Ins. Co., 529 F.3d 714 (6th Cir. 2008), the Sixth Circuit declined to protect an employee's disclosure of a company's confidential information for purposes of a retaliation claim.  In that matter, the plaintiff, through her work as a field claims specialist, had access to confidential documents related to the defendant's policyholders.  Id. at 726–27.  Another employee filed a class action lawsuit alleging gender discrimination by the defendant, and the plaintiff opted in to the suit.  Id. at 717.  After opting in, the plaintiff began to suspect that the defendant was retaliating against her, and she began collecting confidential documents containing policyholder information.  Id. at 718.  When the defendant learned that the plaintiff had taken such documents, it terminated her employment.  Id.  The district court found that the defendant's interest in ensuring compliance with its privacy policies and in maintaining the confidentiality of its clients' personal information outweighed the plaintiff's interest in preserving what she perceived to be evidence of retaliation.  Id. at 726.  On appeal, the Sixth

Circuit identified six factors—adopted from the Fifth Circuit—that are relevant in determining whether the plaintiff's procurement of confidential documents was reasonable: (1) how the documents were obtained; (2) to whom the documents were produced; (3) the contents of the documents, both in terms of the need to keep the information confidential and their relevance to the employee's claim of unlawful conduct; (4) why the documents were produced, including whether production was in direct response to a discovery request; (5) the scope of the employer's privacy policy; and (6) the ability of the employee to preserve the evidence in a manner that does not violate the employer's privacy policy. Id. at 726 (citing Jeffries v. Harris Cnty. Cmty. Action Ass'n, 615 F.2d 1025, 1036 (5th Cir. 1980). Analyzing such factors, the court found that the plaintiff's production of confidential documents was not reasonable and, thus, not protected. Id. at 727.

Although there is a dearth of authority on this issue within the Third Circuit, numerous other federal courts have agreed that the breach of employer confidentiality policies in order to obtain evidence for a discrimination suit does not constitute protected activity. See Shoaf v. Kimberly-Clark Corp., 294 F. Supp. 2d 746, 754–55 (M.D.N.C. 2003) (finding that plaintiff's possession—for purposes of the employee's reverse discrimination suit against defendant—of confidential documents and an audiotape containing conversations among members of the defendant's management team about personnel matters was not protected activity because "[o]n balance, [d]efendant's interest in maintaining the confidentiality of its personnel information and employment practices outweighs [p]laintiff's interest in opposing [d]efendant's allegedly unlawful employment practices by providing such information to [another employee]."); Hellman v. Weisberg, No. Civ.A.06-1465, 2007 WL 4218973, at *3–5 (D. Ariz. Dec. 3, 2007) (holding

that neither the participation clause nor the opposition clause protects an employee's

unauthorized appropriation, copying, and dissemination of confidential documents without a

showing that disclosure was necessary to preserve the documents; "[a] contrary rule would allow

an employee to 'immunize his unreasonable and malicious [acts] simply by filing a

discrimination complaint with a government agency.'" (quotations omitted)), aff'd 360 F. App'x

776 (9th Cir. 2009); Johnson v. Portfolio Recovery Assocs., 682 F. Supp. 2d 560, 581–82 (E.D.

Va. 2009) (declining to find, upon balancing the factors from Niswander, that plaintiff's act of

sharing confidential information with attorney for purposes of a lawsuit constituted protected

activity).

Considering the balancing factors in the present case, the Court does not find that

Plaintiff's act of sharing confidential information with Dorsey for purposes of Dorsey's

discrimination claim constituted protected activity.[4]  As a primary factor, and as noted above,

Plaintiff was employed under a strict confidentiality obligation as follows:

> In the course of performing your duties on behalf of the NewCourtland Network, you
> may, from time to time, be placed in a position of trust and confidence in which you
> receive or contribute to the creation of confidential and/or proprietary information
> relative to the operation of the NewCourtland Network.  Access to and transmittal of
> any confidential information is strictly limited to that needed for the performance of
> any employee's duties related to their position to further Company's business
> interests, and employees may not use or disclose such confidential and/or proprietary
> information for personal gain or for any purpose which does not further and/or that
> is inconsistent with the business interests of the NewCourtland Network.

(Defs.' Mot. Summ. J., Ex. K.)  Although Plaintiff, as a Human Resources generalist, properly

---

[4]  Notably, Plaintiff does not even acknowledge any of the foregoing cases, let alone make
an effort to distinguish and/or apply them to the present facts.  Rather, she simply assumes that
Defendants' articulated reason for her termination—*i.e.*, disclosure of confidential information to
Dorsey to assist in her EEOC charge and litigation—automatically qualifies as direct evidence of
retaliation.

14

had access to job applicant information, she was bound by both company policy and her fiduciary

duty to Defendants to not improperly disclose such information.  Nonetheless, she released this

information to a family member who was not a NewCourtland employee with the hope that it

would assist in later-filed litigation.  Moreover, the information she disclosed was personal and

sensitive to the applicants to which it referred, and had been entrusted to Defendants by such

individuals for purposes of their job applications.  Further, Plaintiff offered no evidence to show

that her actions were necessary to preserve this information or that Defendants had any intention

of destroying such information.  Indeed, Dorsey could have easily requested this information via

the proper discovery channels.  Ultimately, to sanction such behavior would allow Plaintiff to

immunize her improper acts simply by filing a retaliation lawsuit.  As Title VII's retaliation

provisions were not meant to protect such actions, the Court declines to hold that Plaintiff's

improper disclosure of confidential information in this case constituted protected conduct.

In short, Plaintiff's only "direct evidence" of retaliation for protected activity fails to pass

judicial muster.  Accordingly, the Court declines to apply the Price Waterhouse test and, instead,

turns to an analysis under the McDonnell Douglas burden-shifting analysis.

### B.     *McDonnell Douglas* Burden-Shifting Analysis

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme

Court set forth the precise framework for analyzing a claim based upon retaliation where, as here,

there is no direct evidence of retaliation.  First, the plaintiff must prove, by a preponderance of

evidence, a prima facie case of the three elements of retaliation: protected activity, adverse

employment action, and causal relation.  McDonnell Douglas, 411 U.S. at 802.  If the plaintiff

establishes a prima facie case, a "presumption" of retaliation is created and the burden of

15

production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  Id. at 802–03.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."  Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981).  The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (emphasis in original).  The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, non-retaliatory reasons.  Id.

Finally, if the employer meets its burden of production, the presumption of discrimination created by the plaintiff's prima facie case "drops out of the picture."  Id. at 511 (citing McDonnell Douglas).  In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion."  Mitchell v. Miller, 884 F. Supp. 2d 334, 370–71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original)).  "Nevertheless, evidence

suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." Mitchell, 884 F. Supp. 2d at 371 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147–48 (2000)).

Proceeding under this McDonnell Douglas analysis, Defendants now challenge Plaintiff's retaliation claim on two grounds. First, they assert that Plaintiff has failed to establish causation as part of her prima facie case. Second, and alternatively, they aver that even if Plaintiff can set forth a prima facie case, she has failed to create a genuine issue of material fact as to whether Defendants' legitimate non-discriminatory reason for her termination was pretext for retaliation. For purposes of this summary judgment ruling only, the Court will assume that Plaintiff has established her prima face case,[5] and will address only the issue of pretext.

As noted above, once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the challenged adverse employment actions. All the employer needs to do at this juncture is introduce admissible evidence that, if taken as true, would "*permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons." Mitchell, 884 F. Supp. 2d at 370 (emphasis in original).

---

[5] Undoubtedly, Plaintiff has alleged protected activity in the form of testifying on behalf of her sister in Dorsey's discrimination suit against Defendant. Moreover, it is undisputed that Plaintiff was terminated by Defendant, thereby constituting an adverse employment action. With respect to causation, the parties hotly contest the proper standard to be applied. As this Memorandum does not reach the causation question, however, the Court need not and does not resolve the question of which standard applies.

17

Defendants, in this case, have done so.  According to the undisputed facts, in May 2010, Plaintiff's sister, Dorsey, filed a charge of discrimination with the EEOC that included confidential information related to the other maintenance applicants for the position with NewCourtland, including information about their experience, background tests, and drug tests. (Def.'s Mot. Summ. J., Ex. O.)  Cheltenham Human Resources Manager, Sharon Gaumont, testified that, upon seeing Dorsey's EEOC charge, she suspected that the information within it must have come from Plaintiff, but Plaintiff denied any wrongdoing.  (Def.'s Mot. Summ. J., Ex. P, Dep. of Sharon Gaumont, 49:20–52:8, Mar. 6, 2014 ("Gaumont Dep.").)  Although Gaumont also approached Sanford-Adams with this suspicion, Sanford-Adams declined to act on it in the absence of any clear proof that Plaintiff disclosed this information.  (Id.)  Thereafter, in August 2011, Dorsey commenced federal litigation, at which time Defendant became aware that Plaintiff would be a witness in support of Dorsey's discrimination claim.  (2014 Johnson Dep. 33:4–16; Def.'s Mot. Summ. J., Ex. Q, ¶¶ 26–29.)

Nonetheless, Defendant took no retaliatory action against Plaintiff at that time.  Rather, Plaintiff remained employed at Cheltenham until it was sold in June 2011.  At that juncture, and in spite of Dorsey's pending EEOC charge, Defendant gave Plaintiff a promotion to work at the Germantown Home facility, and provided her a raise in connection with her promotion.  (Defs.' Mot. Summ. J., Exs. G & H; 2014 Johnson Dep. 17:6–9.)  Indeed, no adverse employment action was taken against Plaintiff until after Dorsey testified in connection with her own litigation on February 28, 2012.  At that deposition, Dorsey stated that Plaintiff had filled out and signed Dorsey's employment application to NewCourtland on Dorsey's behalf, and that the application contained some inaccurate information.  (Dorsey Dep. 88:21–89:25, 100:13–102:25, 108:8–24,

111:4–12.)  In addition, Dorsey testified that Plaintiff provided her the confidential information contained in the EEOC charge.  (Id. at 185:5–188:19.)  Three days later—approximately twenty-two months after Dorsey's EEOC charge, and almost seven months after the filing of the Dorsey litigation—NewCourtland terminated Plaintiff's employment.  The termination letter explicitly stated that the decision was based on Plaintiff's false certification of Dorsey's employment application and Plaintiff's disclosure of confidential NewCourtland information to her sister.  (Def.'s Mot. Summ. J., Ex. I.)

Given these legitimate, non-retaliatory reasons for Plaintiff's termination, the burden now shifts to Plaintiff to demonstrate that Defendants' reasons are nothing more than pretext.  As noted above, in order to establish that a defendant is liable for illegal retaliation, a plaintiff must ultimately convince the trier of fact that a retaliatory animus was the real reason for the adverse employment action at issue.  Fuentes, 32 F.3d at 765.  A plaintiff can show pretext in one of two ways: "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764.  Under the law of this Circuit, it is incumbent upon Plaintiff to point to evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Id.

In an effort to discredit Defendants' legitimate, nondiscriminatory reason and to inject an issue of material fact into the question of pretext, Plaintiff presents four separate arguments.  The

19

Court considers each individually.

### 1.  Whether the Timing of Plaintiff's Termination Shows Pretext

First, Plaintiff asserts that the timing of her termination injects doubt into Defendants' stated rationale.  She asserts that prior to Dorsey's deposition, Defendants knew only that Plaintiff was going to be a witness without knowing what position she would take.  As of February 28, 2012, the date of Dorsey's deposition, however, they learned the extent of Plaintiff's testimony and how crucial it would be to Dorsey's case.  In other words, it was not until Dorsey's deposition that Defendants allegedly confirmed that Johnson had provided assistance to her sister and would be a *favorable* witness to Dorsey during her lawsuit. According to Plaintiff, as a result of this new information, Defendants terminated Plaintiff three days later.

While plausible on its face, this argument disregards the principal that "[m]erely engaging in a protected activity prior to suffering an adverse employment action does not give rise to a harm cognizable as retaliation under Title VII or the ADEA."  Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home, No. Civ.A.13-2463, 2014 WL 2921534, at *6 (E.D. Pa. June 27, 2014).  Rather, "a causal link between an employee's protected activity and an adverse employment action against that employee may be broken by intervening events."  Outten v. Genesis Health Care, LLC, No. Civ.A.13-4708, 2014 WL 3964918, at *12 (E.D. Pa. Aug. 12, 2014).

In this case, the temporal relation of the pertinent facts shows that the immediate catalyst for Plaintiff's termination was not her protected activity of assisting her sister's pursuit of a discrimination claim, but rather her improper conduct with respect to her sister's employment

20

application and EEOC charge.  As discussed above, Defendants already suspected that Plaintiff

was aiding her sister with her claims as of the EEOC charge filed in December 2009, which

identified confidential information that had been in Plaintiff's possession.  Defendants then

confirmed, as of the subsequent filing of the lawsuit in August 2011, that Plaintiff was going to

be a witness in the case.  The favorability of her testimony to Dorsey's claim was obvious given

that: (a) Plaintiff was Dorsey's sister; (b) Dorsey's complaint alleged that "[Plaintiff Johnson]

formed the opinion that [Dorsey] was being discriminated against based upon her gender;" and

(c) the complaint stated that Plaintiff told Human Resources management that Dorsey was

contemplating filing a suit against NewCourtland.  (Defs.' Mot. Summ. J, Ex. Q, ¶¶ 26–29.)  Yet,

despite knowing all of this information, Defendants not only permitted Plaintiff stay on as an

employee of NewCourtland, but allowed her a raise and a promotion.  Thereafter, at Dorsey's

deposition, six months after the filing of the lawsuit, Defendants learned nothing new about the

extent or favorability of Plaintiff's testimony.[6]  Rather, the sole new information learned at

Dorsey's deposition was Dorsey's confirmation that Plaintiff had, in fact, (1) provided her with

confidential information and (2) filled out and signed Dorsey's name on the employment

application.  Plaintiff was ultimately terminated on those precise bases, thus lending support to

Defendants' nondiscriminatory reasons.  The mere fact that Plaintiff was also engaged in ongoing

protected activity when Defendants obtained proof of her misconduct does not prohibit

Defendants from taking adverse employment action against Plaintiff because of that misconduct.

_____

[6]  Indeed, Plaintiff herself conceded that Dorsey offered no new information about Plaintiff's  role in the lawsuit, and that Plaintiff did not give a deposition clarifying what exactly she planned to say on behalf of her sister's case until *after* she was terminated.  (2014 Johnson Dep. 174:2–18.)

To so hold would result in an employer's complete inability to terminate a problematic employee if that employee happened to be engaged in protected activity.  Title VII does not extend that far.

### 2.    Whether Similarly-Situated Employees Were Treated More Favorably

Plaintiff's second effort to establish pretext contends that she was treated less favorably than similarly-situated employees who also violated the confidentiality policy.  At her deposition, Plaintiff testified that, in her human resources role, she knew of other employees who breached NewCourtland's confidentiality policy.  Yet, Sanford-Adams simply disciplined such employees and sent them back to work.  (2014 Johnson Dep. 124:14–22.)  For example, Plaintiff described an administrative employee named Amy Vuong, who provided confidential information to the maintenance director in her building about why a maintenance employee in a different building was terminated.  (Id. at 148:6–14.)  Ms. Vuong was disciplined, but not terminated for her infraction.  (Id. at 148:13–14, 149:1–5.)  In addition, Plaintiff remarked that Sharon Gaumont, the Human Resources manager, violated the confidentiality policy three to four times.  (Id. at 14:11–22.)  On one occasion, Plaintiff complained to Sanford-Adams that Gaumont was having lunch with the staffing coordinator and telling her about the different investigations Gaumont had going on with the different employees in the building.  (Id. at 168:18–169:7.)  Gaumont was not disciplined or terminated.  (Id. at 151:9–11.)  On another occasion, Gaumont allegedly told one employee that another employee made a complaint about her.  (Id. at 169:12–24.)  Finally, on a third occasion, an employee named Sherry Jensen complained because Gaumont's best friend of forty-five years was Jensen's mother-in-law with whom Gaumont spoke a couple of times a week on the phone.  (Id. at 170:13–18; Gaumont Dep. 58:5-8, 59:11–15.)  One day, when Jensen had

22

not been at work for some time, Gaumont asked her friend if Jensen was okay.  (<u>Id.</u> at 59:13–18.)

Jensen complained that it was a breach for Gaumont to tell her mother-in-law about her work

absence.  (<u>Id.</u> at 60:19–22.)  Gaumont was disciplined and suspended for this infraction, but not

terminated.  (2014 Johnson Dep. 170:17–18.)

      Upon closer review, however, Plaintiff's comparators are not sufficiently similarly

situated to establish pretext.  To be "similarly situated" for the purposes of a workplace

discrimination or retaliation case, "comparator employees 'must be similarly situated in all

relevant respects.'"  <u>Philpot v. Amtrak</u>, No. Civ.A.10-1276, 2011 WL 5339030, at *6 (E.D. Pa.

Nov. 3, 2011) (citing <u>Wilcher v. Postmaster Gen.</u>, 441 F. App'x 879, 882 (3d Cir. 2011)) (further

citations omitted).  As the Third Circuit has explained, "[a] determination of whether employees

are similarly situated takes into account factors such as the employee's job responsibilities, the

supervisors and decision-makers, and the nature of the misconduct engaged in."  <u>Wilcher</u>, 441 F.

App'x at 882.  If two employees "engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish . . . the employer's treatment of them," they will

be deemed "similarly situated."  <u>McCullers v. Napolitano</u>, 427 F. App'x 190, 195 (3d Cir. 2011)

(quotation omitted).  By the same token, if their conduct differed in a way that would be material

to an employer, they will not be considered proper comparators.  <u>See</u> <u>Id.</u>  In the discipline

context, a plaintiff must show that the alleged comparator's acts "were of comparable seriousness

to his own infraction, and that the [comparator] engaged in the same conduct without such

differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or

the employer's resulting treatment of [him]."  <u>Tyler v. SEPTA</u>, No. Civ.A.99–4825, 2002 WL

31965896, at *3 (E.D. Pa. Nov. 8, 2002), <u>aff'd</u>, 85 F. App'x 875 (3rd Cir. 2003).  "[S]ummary

judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated." Abdul-Latif v. Cnty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014).

In this case, aside from her false certification of Dorsey's employment application, Plaintiff was terminated for taking sensitive, confidential information about other job applicants—information about their background checks, drug tests, and employment history—and disclosing it to a non-employee family member for use in the family member's own application to NewCourtland and subsequently-filed EEOC charge. Given the seriousness of such confidentiality breaches, neither Amy Vuong nor Sharon Gaumont are similarly situated such that their situations cast doubt on Defendants' legitimate nondiscriminatory reason. With respect to Amy Vuong, Plaintiff offers nothing more than scant and vague testimony, unaccompanied by any documentary evidence, that Vuong was not harshly disciplined for disclosing details about the termination of one NewCourtland employee to another NewCourtland employee. The Court notes, however, that such conduct does not, by any logical standard, rise to the level of Plaintiff's disclosures to a non-employee. Nor was there any suggestion that Vuong also forged a signature on a third-party employment application.

Similarly, Gaumont's infractions do not equate to those of Plaintiff. Plaintiff's testimony that she heard Gaumont talking about ongoing investigations within the company with a NewCourtland staffing coordinator fails to establish that such a discussion constituted any breach of confidentiality or that the unnamed staffing coordinator was not privileged to hear such information. Moreover, Gaumont's apparently inadvertent revelation that a NewCourtland employee was not at work—made in the context of asking a personal friend whether the

24

employee was okay—does not rise to the level of Plaintiff's surreptitious gathering of sensitive

information about other job applicants to assist her sister.  Indeed, the fact that Mrs. Gaumont

was actually suspended for this latter incident—a relatively minor infraction by all

accounts—lends support to Defendants' decision to terminate Plaintiff for a far more serious

violation of the confidentiality policy combined with her improper certification of Dorsey's

employment application.  Undoubtedly, "[t]he difference in the severity of the misconduct is a

legitimate, non-discriminatory reason for the difference in the severity of the punishment."

Martonik v. Donahoe, No. Civ.A.12-704, 2013 WL 5875530, at *8 (W.D. Pa. Oct. 30, 2013).  As

no reasonable jury could find that the comparators were similarly situated in all relevant respects,

summary judgment on this point is appropriate.[7]

---

[7] The cases cited by Plaintiff on this issue—aside from being from outside the Third
Circuit—are inapposite.  In Appelbaum v. Milwaukee Metropolitan Sewerage Dist., 340 F.3d
573 (7th Cir. 2003), the plaintiff and the comparator worked in the same department, were both
supervised and ultimately disciplined by the same person, and were subject to the same standards
vis-à-vis confidentiality and insubordination.  Id. at 580–81.  The court found that "[t]he fact that
[the plaintiff] was fired for her breach of the department's confidentiality policy, while [the
comparator] was merely suspended for an insubordinate refusal to cooperate with the
enforcement of that same policy, could be viewed as a disparate treatment of two similarly
situated employees."  Id. at 581.  This evidence, combined with the defendant's ever-shifting
reasons for plaintiff's termination, created a genuine issue of material fact as to pretext.  Id. at
580.  In the present case, Plaintiff's violation of the confidentiality policy was substantially more
serious than either Vuong's or Gaumont's, in addition to the fact that she was also accused of
falsifying her sister's employment application.  Moreover, unlike in Appelbaum, Defendants'
reasons for Plaintiff's termination have remained steadfastly the same.
    Plaintiff's other cases cited in support are similarly unpersuasive in that pretext was
shown in multiple forms aside from mere disparate treatment of similarly situated employees.
See Cooper-Houston v. Southern Ry., 37 F.3d 603, 605 (11th Cir. 1994) (holding, in cursory
fashion, that plaintiff "presented evidence that she was treated less favorably than her white
co-worker in terms of work schedule, job assignments, absences, lateness and that her conduct
was generally given greater scrutiny. [Plaintiff] also presented evidence that racially derogatory
remarks were made by her co-workers, including comments by Chief Waggoner."); Womack v.
Del. Highlands Al Servs. Provider, LLC, 883 F. Supp. 2d 1013 (D. Kan. 2012) ("There is
sufficient evidence from which a reasonable jury could rationally find that the defendant's stated

### 3.    Whether Abandonment of the Disciplinary Procedure Shows Pretext

Third, Plaintiff argues that Defendants "abandoned all regular procedures and policies when they terminated her employment on the spot, with no investigation, no suspension, no progressive discipline and no opportunity for Ms. Johnson to confront the allegations and/or provide a statement." (Pl.'s Resp. Opp'n Summ. J. 35.) Specifically, Plaintiff testified that Defendants maintained a progressive disciplinary procedure in which they would: (a) first present the employee with the accusation; (b) provide the employee an opportunity to give an explanation or write a statement; (c) conduct an investigation; and, if necessary, (d) suspend the employee pending the results of the investigation into the allegations. (2014 Johnson Dep. 143:13–144:18, 144:22–145:9.) Then, at the conclusion of the investigation, there would be a decision to either terminate or start an alternative disciplinary process. (Id. at 145:10–20.) She had never seen an employee fired on the spot. (Id. at 144:1–21.) Moreover, she had never seen the process abandoned, even for a serious infraction. (Id. at 146:5–147:2.) When Plaintiff was terminated, however, Defendants did not formally notify her of the allegations against her, did not conduct an investigation, did not ask her to write a statement, and did not suspend her prior to her termination. (Id. at 153:4–19.) According to Plaintiff, this total abandonment of the disciplinary process injects doubt into Defendants' purported reasons for her termination and

---

reasons for termination are unworthy of credence and could infer a retaliatory motive because of the defendant's inconsistent and changing reasons given for termination, the defendant's lack of a formal HIPAA policy on the hospice referrals, the defendant's failure to investigate and enforce consistently the unwritten policy and practice on hospice referrals, the defendant's contradiction of its own corrective action notice, and the temporal proximity between the plaintiff's protected opposition and her termination."). Plaintiff, in this case, has not produced any of these other types of evidence.

creates a genuine issue of material fact as to pretext.

This contention, however, fails in several respects.  First, although Plaintiff was unaware of a specific occasion when termination was automatic, Sanford-Adams testified that the progressive discipline policy spoke to times when the termination warranted skipping one or all of the steps in that process.  (Sanford-Adams Dep. 21:2–6, 21:9:5–30:5.)  In fact, the NewCourtland employee handbook specifically noted that in cases involving serious misconduct or any time that the supervisor deemed it necessary, the progressive disciplinary procedure could be disregarded and the employee could be terminated.  (Id. at 31:8–33:19.)  Sanford-Adams explained that she decided to terminate Plaintiff immediately, in lieu of issuing a discipline or suspending her, because "she falsified the application and shared confidential information, and as an HR professional, she comes into contact with a lot of confidential information, and that cannot be shared."  (Id. at 67:7–11.)

In addition, the nature of the evidence against Plaintiff undercut the need for an investigation.  At her deposition, Plaintiff conceded that in all the times she participated in other investigations or suspensions, the evidence about the breaches of confidentiality never came in the form of sworn deposition testimony.  (Id. at 156:9–157:4.)  Nor was Plaintiff aware of a breach of confidentiality allegation where the person providing the evidence of the alleged breach was a family member or close friend of the person committing the breach.  (Id. at 157:15–22.)  By contrast, in Plaintiff's situation, her own sister gave sworn testimony, under oath, that Plaintiff had filled out and signed Dorsey's name on the employment application and that Plaintiff had provided Dorsey with confidential information regarding the other applicants for the maintenance position at NewCourtland.  In light of the direct evidence of Plaintiff's

27

wrongdoing—given under penalty of perjury by a person with Plaintiff's interests at heart—any investigation by Defendants would not have yielded any new information about Plaintiff's actions.[8]   Plaintiff conceded that fact and agreed that if her sister's testimony were to be believed, termination was proper.   (2014 Johnson Dep. 126:14–127:1.)

Finally, the Court notes that Defendants suspected that Plaintiff had violated the confidentiality policy as of the date of Dorsey's filing of her EEOC charge in May 2010, yet opted to take no action in the absence of affirmative proof that Plaintiff had done so.   (Gaumont Dep. 51:5–52:16.)   Indeed, in lieu of notifying Plaintiff of the allegations brought against her by Gaumont and starting an investigation into such allegations, Defendants promoted Plaintiff, gave

---

[8]  Plaintiff argues that,

> Defendants have taken the ridiculous position in this matter that because they learned of Ms. Johnson's alleged policy violations during the course of sworn deposition testimony, there was no need to further investigate or follow the normal steps and procedures in terminating Ms. Johnson's employment since Defendants allege that everything Ms. Dorsey testified to must have been true.  It is inherently contradictory that at the same time Ms. Dorsey's allegations of discriminatory conduct that she testified to were vehemently denied as false, Defendants have taken the position that everything Ms. Dorsey said regarding Ms. Johnson's alleged conduct must have been true merely because it was testimony given under oath.

(Pl.'s Resp. Opp'n Summ. J. 36–37.)

Plaintiff, however, misunderstands the very different nature of Ms. Dorsey's testimony regarding her allegations of discrimination and her testimony regarding Plaintiff's actions.  Her allegations of discrimination were made in her own interest, thereby removing any indicia of reliability.  On the other hand, as Plaintiff is Dorsey's sister and a person acting on Dorsey's behalf, Dorsey would have no reason to falsely implicate Plaintiff in any wrongdoing. Defendants were, therefore, justified in crediting Dorsey's statements to the extent they inculpated her own sister, while challenging Dorsey's statements to the extent they bolstered her discrimination claim.  See generally Williamson v. United States, 512 U.S. 594, 599–600 (1994) (explaining, in connection with the "statement against interest" exception to the hearsay rule, "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts.  One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.").

her a raise, and maintained her as an employee in good standing—a favorable deviation from the

disciplinary policy.  Thus, when Defendants got clear confirmation of Plaintiff's misdeeds, their

decision to terminate was not quite as sudden and unexpected as Plaintiff might suggest.  In

short, once Defendants had clear, undeniable evidence of Plaintiff's breach of the confidentiality

policy and falsification of her sister's employment application, their decision to forego the

progressive disciplinary procedure does not constitute evidence of pretext.

### 4.   Whether Discrepancies in Defendants' Claim that Plaintiff Was Fired for Falsification of an Employment Application Show Pretext

In a final effort to prove pretext, Plaintiff asserts that Defendants' claim that they

terminated her due to her alleged falsification of Dorsey's employment application suffers from

multiple discrepancies.  First, Plaintiff asserts that, according to her clear deposition testimony,

she did not know that anything in the employment application was false and she would not have

submitted it if she had known.  Rather, she merely transcribed the information provided to her by

Dorsey and confirmed the accuracy of its contents with Dorsey before submitting the application

on her behalf—a common practice for Human Resource employees.  Moreover, Plaintiff notes

that, according to the undisputed evidence, Sanford-Adams had no knowledge that the

information contained in Dorsey's job application was actually false at the time she made the

decision to terminate Plaintiff's employment.  According to Plaintiff, these facts cast significant

doubt on one of Defendants' alleged reasons for her termination.

As to the first point, Plaintiff seems to misunderstand what Defendants construed as

falsification.  Plaintiff adamantly asserted that she filled out the applicant accurately with all of

the information her sister gave her, under an assumption that such information was true, and then

signed her sister's name.  What Plaintiff ignores, however, is that not only did she sign the

application—which certified the accuracy of all of the information contained thereon—without

having actual knowledge of the truth and accuracy, but she actually signed the application with

her sister's name, meaning she falsified from whom the certification came.  (2014 Johnson Dep.

59:6–63:3.)  Specifically, Sanford-Adams explained as follows:

> Q.    What is your understanding of falsifying an employment application?
> A.    Presenting something that is not true.
> Q.    So what was untrue about that application.
> A.    That the signature was that of Tanya Dorsey's.
> Q.    What is the purpose of the signature.
> A.    To confirm that everything on the form is accurate.
> Q.    So do you know sitting here today whether or not anything on that form was inaccurate?
> A.    I don't know that.
> Q.    Do you now sitting here today whether or not anything on that form was false?
> A.    Yes.
> Q.    What?
> A.    That the signature was Ms. Dorsey's.
> Q.    Other than the signature.
> A.    There could have been other things, but I do know that the signature was not that of Ms. Dorsey's, and it was presented as it was.

(Sanford-Adams Dep. 61:2–24.)

As to the second point, Sanford-Adams did not, contrary to Plaintiff's argument, state that

she did not know about the falsity of the information contained application prior to terminating

Plaintiff.  Rather, she merely explained that during her deposition, she could not identify which

information was false or inaccurate.  At the time of Plaintiff's termination, however, Sanford-

Adams was well aware that the application had been falsified:

> Q.    How did you first become aware of this alleged falsification of the application?
> A.    I became aware of the falsification of the application after Ms. Dorsey's

> deposition.
>
> Q.    Who made you aware?
>
> A.    My counsel.
>
> Q.    At that time what did you do with the information?
>
> A.    I conferred with my counsel, and then we talked about what was necessary
>       to move forward, and I prepared a termination letter.

(Id. at 62:17–63:3.)  In short, the evidence reflects no discrepancies from which a reasonable

juror could choose to disbelief Defendants' stated basis for Plaintiff's termination.  Absent such

evidence, Plaintiff cannot establish that this reason was simply pretext for retaliation.

### 5.    Conclusion as to Pretext

Ultimately, Plaintiff has not met her burden of proof to establish that a reasonable jury

could find that Defendants' legitimate, non-retaliatory reasons for terminating Plaintiff's

employment were a pretextual cover for retaliation.  As noted above, "[l]iability cannot be

established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse

employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that

the action was taken on the basis of an impermissible discriminatory criterion."  Mitchell, 884 F.

Supp. 2d at 370–71 (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. at 519).

Plaintiff, however, has not put forth any evidence to cast doubt on or create a genuine issue of

material fact as to the veracity of Defendants' basis for termination.  Plaintiff concedes that she

filled out her sister's employment application and signed her sister's name on her behalf.

Moreover, Dorsey confirmed under oath what Defendants suspected almost two years

earlier—that Plaintiff had provided her sister with confidential information about other job

applicants.  The fact that Defendants did not discover Plaintiff's wrongdoing until after Plaintiff

began engaging in the protected activity of helping with her sister's discrimination suit does not

mean that Title VII precludes Defendants from disciplining Plaintiff for such wrongdoing.  Faced with the relatively undisputed record in this case, the Court finds that no genuine issue of material fact as to pretext that would preclude dismissal of this claim.

## IV.    CONCLUSION

In light of the foregoing, the Court must grant Defendants' Motion for Summary Judgment.  Plaintiff has not come forth with any direct evidence of retaliation due to "protected activity."  Moreover, under the McDonnell Douglas burden-shifting analysis, Plaintiff has failed to create a genuine issue of material fact as to the veracity of Defendants' legitimate reasons for her termination.  As such, judgment shall be entered in favor of Defendants and against Plaintiff on the entirety of Plaintiff's Amended Complaint.

An appropriate Order follows.